MORGAN CONST. CO. et al. v. FORTER–MILLER ENGINEERING CO. et al.

(Circuit Court of Appeals, Third Circuit.   February 10, 1914.)

No. 1775.

PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—FURNACE FOR HEATING INGOTS.

The Morgan patent, No. 632,020, for a furnace for heating steel ingots or billets preparatory to rolling covers a device which was novel, useful, and inventive in character, being the first to provide for the discharge from the furnace automatically of a continuous and uniform rapid succession of uniformly heated billets, which are also automatically charged into the furnace; the result being a saving of 25 cents or more per ton in the labor cost of heating the billets besides obviating the necessity for labor under fierce heat conditions; also *held* infringed as to claims 3, 4, 5, 6, and 7.

Appeal from the District Court of the United States for the Western District of Pennsylvania; James S. Young, Judge.

Suit in equity by the Morgan Construction Company and Alexander Laughlin against the Forter-Miller Engineering Company and Dil-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

worth, Porter & Co., Limited. Decree for defendants, and complainants appeal. Reversed.

For opinion below, see 203 Fed. 496.

Christy & Christy, of Pittsburgh, Pa., and J. Nota McGill, of Washington, D. C. (Frederick P. Fish, of New York City, of counsel), for appellants.

C. M. Clarke, of Pittsburgh, Pa., for appellees.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below the Morgan Construction Company and Alexander Laughlin, the plaintiffs, by a bill in equity charged the Forter-Miller Engineering Company and Dilworth, Porter & Company, Limited, with infringing claims 3, 4, 5, 6, and 7 of a patent of which plaintiffs were respectively owner and licensee, viz., patent No. 632,020, applied for August 3, 1896, and granted August 29, 1896, to Charles H. Morgan for a furnace for heating ingots. On final hearing that court held the patent not infringed. From a decree in accord therewith, the plaintiffs took this appeal.

The art here involved is that of a furnace for heating steel ingots or billets preparatory to rolling. To bring such billets to the semiplastic state necessary, the furnace is raised to a heat of about 2,000° Fahrenheit. This must be done at a minimum cost of labor, fuel, and loss of metal by oxidation. The demand of the rolls on the furnace for such hot billets necessitates rapidity and continuity of supply. The extent, rapidity, and continuity of such billet supply can be measurably appreciated from the proofs which show that, in common practice mills turning out the usual output per turn of 200 tons of rods from 165-pound billets, the furnace must furnish at a bright red heat over four of such billets every minute during the 10½ hours of the turn. In view of the rapidity and unceasing character of the work thus necessary to be done under such high heat conditions, it requires no citation of the abundant proof in the record to show we are here dealing not alone with conditions of most exacting mechanical requirements in the way of rapid and continuous transfer, but such transfer must be made under fierce heat surroundings. It will be obvious therefore that, as said by this court in Mott v. Standard, 159 Fed 135, 86 C. C. A. 325, an invention which gives to an important industry a device, labor-saving, effective, and which obviates labor under such fierce heat conditions, is not only a mechanical contribution but one which rises to the plane of the humane. In that regard the plaintiffs contend, as stated in their brief, that:

"The furnace of the Morgan patent in suit was absolutely the first to provide for the discharge from the furnace automatically of a continuous and uniform rapid succession of uniformly heated billets."

That the Morgan furnace accomplishes these results, that it has gone into rapid and general use, is shown by the proofs. Was the machine the first to do such work? If it was, then the foregoing contention is established, and, if so, this patent should be sustained. To this question of priority we now address ourselves.

Prior to Morgan's furnace there were two types of billet-heating furnaces in use. One was the furnace with an ordinary, flat hearth and with doors at one side through which the billets were hand-charged and hand-drawn. Heaters who worked at such standard mills as the Oliver Wire Mills, the American Steel & Wire Company, and the Carnegie Steel Company testified to the use of such furnaces at these works. Laughlin, one of the plaintiffs, gives a clear account of the working of these furnaces. He says:

"A. With the old Siemens furnaces it was usually customary to work billets about 3 feet long, and two rows of these billets were charged in the front doors of the furnaces. The first row of billets was pushed towards the back wall far enough to leave room for a second row of billets between the front wall of the furnace and the ends of the first row of billets. It was customary to have about four doors in one of these Siemens furnaces, and the total number of billets put in a furnace at one time was generally about 90 or 100. The usual practice, however, was not to charge all these billets at once, but to charge two doors, or 45 to 50 billets, at one time. All the charging of these furnaces was done by manual labor. That is, a man picked up a billet, laid it on a flat bar known as a 'peel,' and then the heater or his helper took the handle of this peel, the peel being about 10 feet long, and shoved this peel into the furnace, then slipped the peel out from under the billet, and drew the peel back ready for another billet. The drawing of the billets from this furnace was accomplished in the same way; that is, it was done by manual labor entirely. The heater or his helper would reach into the furnace with a hook and would pull out the front row of billets one at a time; that is, he would pull a billet up to the door, where the telegraph man would take hold of it with a pair of tongs, and would then run with it to the mill. This program was continued until the front row of billets had been pulled out, then the heater would have to reach clear back into the furnace to the second row of billets, and would use his hook to pull this second row of billets up to the door one at a time, and the telegraph man would take hold of each billet with his tongs, and run with it to the mill. As a rod-mill would roll about 2,000 billets in 11 hours, this meant that about 3 billets per minute must be delivered to the mill, and it was therefore the practice to draw two furnaces, or rather have the contents of two furnaces simultaneously drawn, so that there would always be a telegraph man on his way to the rolls. This labor was of course very exhausting, and in hot weather particularly it was almost impossible to deliver billets to the mill fast enough to keep the mill going to its maximum capacity. And it was customary and necessary to have spell hands to assist the telegraph man to get the billets to the mill fast enough to keep the mill going to its capacity."

Swinbank, who worked in the Oliver Mills from 1884 to 1902, and for much of the time was boss heater, testified that the labor cost of four furnaces thus operated was 40 cents a ton with a product of 150 tons in a 10½-hour turn. Gorsuch, also an experienced heater, who had worked in the mills of the other two companies, made the labor cost 51 cents per ton with a product of 165 tons per turn. These furnaces were all retained and operated by these up-to-date companies until the Morgan device came into the art. The second type of furnace in use prior to Morgan was used by the Pittsburgh Wire Company. This type originated in the Allen patent of 1880, No. 234,162, and was built by the Morgan Construction Company, one of the plaintiffs. The Allen was rectangular and relatively long. It had a fuel grate at one end and a stack at the other; the flames thus passing the furnace length. Just back of the grate was a flat hearth, and from this the heated billets were hand-drawn through a side wall door just as in the

furnaces of the Oliver, American, and Carnegie Companies. Where it differed from them was that the billets were machine-charged. At the stack end wall of the furnace was a door through which the billets were charged or pushed in broadside by means of a hydraulic cylinder. As the billets successively entered, they moved forward side by side, on a track consisting of a pair of inclined water-cooled pipes, elevated on longitudinal piers, until they reached the end of the track, whence they were pushed off, one by one, onto the hearth first described. The billet, after being thus mechanically fed and dumped on this hearth was hand-shifted to make room for the succeeding billets, and when finally heated was hand-drawn, endwise as above described, and taken to the rolls.

It will be noted that this furnace, which the Morgan Company, one of the plaintiffs, continued to construct for many years, was an improvement over the other type in that, thermally, it made use of the heat from grate to stack; mechanically, in that it substituted mechanical charging for hand-charging. It reduced labor cost to 28 cents per ton, and its product was from 125 to 150 tons per turn, a saving which apparently was not sufficient to lead such progressive companies, as the Carnegie and the other companies named, to adopt it. These two furnaces were the only means the practical art had found to heat and supply billets to rod mills, and these furnaces, as the best net results of practice and inventive effort, that art continued to use, without progress or improvement for the 16 years between Allen's patent of 1880 and Morgan's of 1896. When the practical art for 16 years failed to find anything of value in the paper art, a court, with like practical views, may agree with the estimate of the practical art, which was that such paper art disclosed nothing of practical value. We, however, select from that art the device which, to judge from the file wrapper, most impressed the patent authorities in passing on Morgan's application. This was German patent No. 74,484 of 1893, to Daelen, shown in accompanying draft:

The proofs show Daelen was a German engineer of repute, and we are justified in regarding his patent as in line with the latest developments in German practice. This patent, thirteen years later than Allen, while it shows the long rectangular furnace of the Allen type, with

its thermal advantage of end to end heat, abandons Allen's mechanical end charging. After the usual manner of German furnaces, holes are put in one of the long sides of the furnace, Daelen's draft shows nine of them, and through them workmen roll over the blocks from the stack to the grate end of the furnace. Indeed, this hand-rolling gives the distinctive name of Rollofen or roll-furnace, to Daelen's device. It will thus be seen that Daelen, instead of contributing a step toward automatic furnaces, was really an abandonment of the mechanical charging which Allen had shown. We would not be understood as belittling what Daelen did, although he himself by suffering his patent to lapse a short time after issue would seem to himself have placed a low estimate upon it, but we are of opinion that Daelen's contribution to the art was in showing automatic furnace-exterior doors placed in vestibules formed on the outside of the charging and exit ends of the furnace, in order to conserve its heat. Without entering into minute details, it suffices to say that, instead of the sliding door then in use at the charging end of the furnace, Daelen makes an opening in the wall just sufficient to admit the charged block. "The opening $F$ is almost entirely closed by blocks $C'$ and $C''$ lying in it on rails $G$," are his words. Outside this stack-end furnace wall he builds his vestibule and instead of, as his patent says, "the heavy sliding door which has to be lifted off each time a block is put in, there is provided at $A$ an auxiliary chamber which is separated from the hearth and susceptible of being closed by an automatically closing hinged door $B$. The latter is pushed open by the block $C$, when put in, and after the passage of the block drops again on the horn $D$ of the pushing device $E$ and closes again when the latter moves back. The opening $F$ is almost entirely closed by blocks $C'$ and $C''$ lying in it on rails $G$. By the introduction of $C'$, $C''$ is pushed forward a certain distance sufficient to cause it to drop down from $G$ upon the hearth $H$, where it is rolled on by hand in the usual manner by means of implements introduced through the doors $J$." In the same way, when the block was rolled on the inclined floor to the other end of the furnace, and obviously to do away with a sliding door at that end, Daelen provided an opening in the furnace end, and, as the patent says:

"In order to do away with the sliding door at this end also, another auxiliary chamber $M$ is provided above $K$, which is closed by an automatically hinged door $N$."

From this it will be seen that the significance of Daelen's device was these two vestibules or auxiliary chambers, both separated from the furnace. Such exterior furnace devices had nothing in common with a device like Morgan's, which, as we will see, was an interior furnace device. As a part of the prior art, Daelen threw no light on Morgan's problem of an interior furnace device; and as a foreign publication it had no effect on Morgan's patent because as said in Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33, in neither description or drawings was it a substantial representation of Morgan s invention in such full, clear, and exact terms as to enable any persons skilled in the art to

practice such invention. In this state of the art, Morgan disclosed the device of his patent of 1896 in the accompanying sketch:

Fig. 6.

This shows an elongated rectangular furnace, in which billets, broadside and in succession, are mechanically fed and pushed forward on elevated, water-cooled, skid pipes, all exactly as the Allen furnace had done for 16 years. Instead, however, of providing, as Allen did, a hearth within the furnace, upon which the billets received their final, sufficient, but not over sufficient, rolling heat, Morgan kept his billets on the skids and pushed them forward through such a zone of heat as they got on the Allen hearth and which is called in his patent the "zone of maximum heat." At this point we then have on the skids a billet, mechanically-charged as was Allen's, but differing from Allen's in that it is, while on the skid track, raised to the desired heat for discharge. In order to automatically discharge such billet without any appreciable loss of heat, Morgan projects upwardly from the discharge door in the front furnace wall, and back into the furnace, an inclined track or chute, the inner apex of which joins the billet-supporting skid pipe in the "zone of maximum heat." When therefore the speed of the pusher and the mixture of air and gas are properly set, the charging of each cold billet at one end of the furnace will automatically, and without manual intervention, deliver to the rolls a properly heated billet at the other. When we consider that we are here dealing with such very high temperatures and such varying and selective stages thereof as are indispensable to the proper heating of the billets for rolling, and that by this device and the proper setting of gas and air supply and of charging speed, this mechanism will automatically both properly heat the 160-odd tons of a 10½ hours' turn, and when so properly heated will mechanically discharge them we can see we have a device that is as wonderful as it is novel. It brought into the art what it had never known, an automatic heating and discharging continuous furnace. The machine has gone into general use; the complainants between them having built some 115 furnaces. As a labor-saving device the proof shows:

It "did away with the men who had to put the billets on the peels with the Siemens furnaces, with the men who had to draw the billets from the hearth of the Siemens furnaces up to the doors of the furnace, and with the tele-

graph men who had to pick up each billet with a pair of tongs and deliver the same to the mill. The result was that, where the average rod-mill with four Siemens furnaces used about 16 or 17 men for the heating furnace crew, we cut this down with our automatic gravity discharge furnaces to not to exceed five men. When I say 'not to exceed five men,' I mean that I have seen mills operated where they only had one heater's helper for two automatic gravity-discharge furnaces, instead of two heater's helpers as most of the mills have for two automatic gravity-discharge furnaces."

As to its money saving, the proof shows that the Oliver Wire Works, in heating wages, saves on a daily product of 350 tons, $105 a day. The proof as to other mills is:

"A. The wages saving would vary with the kind of mill which the furnaces heated billets for. In a rod-mill the cost of heating with the Siemens furnaces was from 40 to 45 cents per ton. When I say 'the cost of heating,' I mean the wages for heating. With our automatic gravity-discharge furnaces the cost of heating for a rod-mill, that is, the wages on these furnaces, is from 12 to 20 cents per ton. I think therefore it is conservative to say that the saving in wages for heating where the furnaces were used for a rod-mill was about 25 cents per ton. In merchant bar mills the saving per ton was somewhat greater, as the wages for heating on these merchant mills was somewhat more than on the rod-mills. I have in mind one plant where they had three Siemens heating furnaces supplying a 12-inch mill with steel, and the wages on these three Siemens furnaces was 68.6 cents per ton. We tore down these three Siemens furnaces and replaced them with one automatic gravity-discharge furnace, the result being that we reduced the wages for heating to about 23 cents per ton, so that in the case of this merchant mill the saving in wages amounted to 45.6 cents per ton. As this merchant mill rolled about 135 tons in 24 hours, this meant a saving of about $60 per day in wages alone, and this saving paid the cost of the installation of the new furnace in about one year's time. I am able to give these figures pretty exactly, as this was the first merchant mill where we induced them to put in the automatic gravity-discharge furnace, and I think this was in about the year 1898."

That the validity of the Morgan patent was recognized in the manufacturing world is shown in the proofs by the large number of the strongest companies that took licenses thereunder. After full consideration, we have reached the conclusion that Morgan's device was novel, useful, and inventive in character, and that the claims here in issue were valid. In that connection we may say that the Laughlin patent No. 582,476, reissue No. 11,666, being subsequent in date of application, in no way affects the scope and validity of Morgan's patent.

We turn next to the question of infringement, and in doing so will take for test Morgan's third claim, which is descriptive generally of his device. That claim is:

"In a furnace for heating ingots or billets, the combination with a heating chamber having openings at opposite ends for the admission and delivery of heated ingots or billets, and an opening for admission of gaseous fuels to said chamber, between its ends, whereby a zone of maximum heat is maintained, of an inclined track extending from said delivery-opening to a point between the charging end of the furnace and a vertical plane passing transversely through said chamber and said fuel-opening, by which a heated ingot or billet is moved by gravity from the zone of maximum heat through said delivery opening, substantially as described."

Study of this patent shows that the gist of the device lies in locating the apex of the discharge incline inside the furnace's zone of maximum heat. Thus the combination of the claim is one "whereby a

zone of maximum heat is maintained," and the apex of the discharge incline is so located that "a heated ingot or billet is moved by gravity from the zone of maximum heat." This is pointedly stated in the specification. After describing the preferred plan of fuel introduction, the patentee says:

"A zone of maximum heat is thereby maintained at the delivery end of the heating chamber and contiguous to the end wall of the chamber with a gradually decreasing temperature toward the entrance end of the chamber."

"Zone" in its ordinary acceptation—temperate, torrid—is a regional word. It implies space, not an imaginary line or point. Indeed, this is shown by the defendant's own proofs. Thus Wellman, an experienced consulting engineer, when asked what was meant by the phrase "zone of maximum heat" in connection with the Morgan type of furnaces, said:

"I should understand that to mean the part of the furnace where the gases in combustion reach their highest temperature."

And in such regional sense is it used in this patent. Thus:

"The billets admitted at the charging end of the furnace are gradually moved along the track *through successive zones of increasing temperature* * * * until the billet reaches the zone of maximum heat, which is either within or approximate to the plane of fuel opening, depending upon the strength and direction of the current of incoming fuel and also upon the strength of the longitudinal current induced by the escape flue at the opposite or charging end of the furnace."

It will likewise be noted that it was also sought to describe it regionally in these words:

"In the furnace shown the gaseous fuel is admitted through the opening 17 and in a plane between the broken lines 17a, 17b, Fig. 6, in a current transversely to the heating chamber. As soon as the current is admitted to the heating chamber through the openings 17 17 it is drawn in a longitudinal direction toward the charging end of the furnace, and the zone of maximum heat will be found somewhere between the broken line 17a, Fig. 6, and the charging end of the furnace, but approximate to the plane of the fuel opening. The space *between* the zone of maximum heat and the delivery opening *forms a zone of greatly reduced heat*, tending to cool the heated billet as it is withdrawn from the furnace and waste the material by oxidation."

It will therefore appear that the zone of maximum heat was a regional furnace space on one side of which were "successive zones of increasing heat" through which the billet came, and on the other side "a zone of greatly reduced heat" through which the billet left. So far therefore as description went, this zone of maximum heat was approximate to the fuel openings plane, and between the "successive zones of increasing heat" and the discharge "zone of greatly reduced heat." It was into this intermediate zone the patentee, and herein lies the gist of his invention, directed the apex of his discharge incline be carried. This is well described by Julian Kennedy, an experienced engineer, who says:

"In heating steel it is very essential that it should not be placed too close to the point where the fuel, especially if it is gas and air, enters the furnace.

"Streams of gas and air introduced into one end of the furnace, at the point where they mingle, do not have a maximum heat, as the gases travel a short

distance before combustion becomes intense, and the highest temperature reached.

"If steel is placed too close to the point where these gases are introduced, not only it does not receive the maximum amount of heat, but the steel itself is liable to be attacked by the oxygen in the air before it has had a chance to thoroughly combine with the carbonaceous fuel in the gas. As is well known, steel at a high heat becomes fuel itself if air comes in contact with it, and is rapidly wasted and burned away.

"This is illustrated very clearly to any one who has seen holes burned through steel by an oxygen blowpipe, or by a pipe conveying highly heated air; and in certain types of furnaces, known as Soaking Pits, it has been found to be very essential that the ports where air and gas mingle, should be kept back at least 24 inches from the sides of the ingot, to avoid burning and wasting away the ingot.

"For this reason, in Continuous Furnaces where the billets have been pushed in from the cold end and fed to the hot end, it has been good practice to withdraw these billets before they reached the other end of the furnace, and in old types of Continuous heating furnaces it has been customary to draw the billets out with tongs through the side of the furnace at some distance from the end where the hot gases are introduced.

"In the patent mentioned in the question, the billets are pushed from the cold end of the furnace toward the hot end of the furnace with a view to discharging them at that end, but to avoid cooling the billet, which would happen if it were pushed clear to the opposite end before being allowed to fall out, the inventor conceived the very happy idea of putting an inclined slope, down which the billets would travel by gravity, at the hot end of the furnace; also carrying the incline back into the furnace to the point where the ingots can be heated without undue waste, and where they will also be in the hot zone of the flame.

"It is manifest on inspection that if these ingots were pushed clear to the end of the furnace, as would be required in a furnace of the prior art, such as that shown in German patent to Daelen, and referred to in the specification of Morgan patent No. 632,020, in order to have it slide out by gravity, the billet would lie for a certain time in a position where the temperature would be considerably below the highest temperature in the furnace, and also where the gases would not have completed combustion; and the oxygen in the incoming air would vigorously attack the billets, causing an extravagant amount of waste.

"In the construction shown in the patent to Morgan, the billets are pushed clear to the point where they can still be in a good hot reducing flame, when a short additional motion causes one billet at a time to slide down the inclined track and out of the door. At the same time, until the billet does start this rapid sliding out from the door, it is back away from the door far enough to protect it from any drafts of air coming through this opening; also, far enough to get it into the hot gases, and far enough away from the end wall of the furnace to protect it from undue radiation. * * *

"The essence of the invention of Morgan is clearly and plainly in arranging a gravity, or automatic, device for quickly taking the billet from the zone of highest heat in the furnace to the outside of the furnace, without allowing it to linger at the end wall, where it would be chilled and possibly oxidized by air accidentally coming in through the crevices around the door left for allowing the bloom to pass out."

The necessity and alleged novelty of thus introducing the apex of the incline within the maximum heat zone is thus set forth in the patent:

"The inclined track 5a differs from the inclined tracks heretofore used in heating furnaces in that it is placed between the delivery-opening 11, through which the heated ingots or billets are delivered from the heating chamber and the zone of maximum heat, so that gravity is made to act upon the heated billet at the time when the ingot or billet has become sufficiently heated by its passage through the zone of maximum heat in order to accelerate its motion

through the space intervening between the zone of maximum heat and the delivery-opening *11* and secure the automatic delivery of the ingot or billet, whereas the inclined section of track in prior furnaces was either placed in front of the zone of maximum heat and served to carry the ingot or billet into the zone of maximum heat and deliver it upon a hearth from which it was withdrawn by an endwise movement by hand, or else it was placed entirely outside the heating chamber and served as an inclined conduit to convey the heated metal from the delivery-opening of the heating chamber to a receptable or a conveyor placed at a considerably lower level than the delivery opening of the heating chamber and leaving a considerable space between the inclined track and the zone of maximum heat through which the heated ingot or billet was moved by the attendant."

It will therefore appear both from the patent, and from the foregoing proof of the heat produced by combining air and gas, that the maximum heat of a chamber, such as Morgan showed, will be produced and in the third claim is aptly described as "a point between the charging end of the furnace and a vertical plane passing transversely through said chamber and said fuel opening." But such language is merely a descriptive aid to relatively localizing the zone of maximum heat and is not a limitation to an admission of the gas from the sides of the furnace. For the patentee says:

"I have described what I consider the most desirable means for maintaining a zone of maximum heat contiguous to the wall of the furnace at the delivery end of the heating chamber, comprising opposing side openings for transverse currents of gaseous fuel and inclined roof surfaces; but I do not wish to confine myself to the specific means described, as the same may be modified and still come within the scope of my claims."

Indeed, a study of the file wrapper shows that the insistence of the office was to find some language to locate relatively the zone when produced. It follows therefore that language inserted for that purpose should be read with that object in view, not as a restriction to the particular form of mechanical path by which the fuel traveled to reach that zone. Thermally the significance of Morgan's device was the maximum heat zone, no matter how created; mechanically it was abstracting the billet from such zone by an inclined, intra-furnace, intra-zone incline. Such being the crux of his invention and such the mode in which he taught the art to practice it, we next inquire whether the defendant has also made use of Morgan's inventive disclosure; in other words, has it a zone of maximum heat and an incline-discharge from within that zone? The accompanying sketch of defendant's furnace shows the elongated, rectangular structure having a stack-end delivery of broad side billets by a mechanical charger:

## DEFENDANTS' FURNACE.

In the other end wall is a subfloor, discharge-opening from which an incline *16* reaches to the discharging end of the inclined water-cooled skid pipe path down which the charged billets successively move. It is plain therefore that the defendants' mechanical arrangements are functionally adapted to effect an automatic discharge of a continuous succession of billets such as Morgan showed. Such being its mechanical, billet-handling devices, we next inquire whether the defendants so introduce their fuel as to make it possible to create their zone of maximum heat so as to regionally embrace the junction of the floor track and the incline. That there will of necessity be a zone of maximum heat in a rectangular furnace where the fuel is introduced at one end and a stack is at the other goes without saying. The proofs show that this zone location may be measurably controlled. As already stated in the testimony of Kennedy, the commingling of air and gas to produce the highest heat can only take place at some distance from the openings through which they separately enter the chamber. Consequently such hottest zone must necessarily be located at some appreciable distance from the end wall of the furnace. The testimony of Wellman shows the possibility of manipulation in measurably shifting the zone of maximum heat. In that regard he says:

"The exact point of highest temperature would be very hard to determine, depending altogether on the manipulation of the gas and air, and chimney damper, by the heater in attendance."

Laughlin calls attention to the distinction between the point and the zone of maximum heat thus:

"The point of highest heat would constantly vary in a furnace depending upon the amount of fuel introduced, the amount of draft, and the speed with which the billets were pushed through the furnace, but there is always a zone of maximum heat, and while the temperature in the different parts of the zone may vary 50°, 80°, 100°, or even more, it is a fact that the lowest temperature in this zone is a high enough heat to keep the billets hot enough for rolling."

And the practical inability to precisely and invariably define and locate the highest point of heat was recognized by the patent authorities, for the patent, as heretofore quoted, itself says that it is dependent "upon the strength and direction of the incoming fuel, and also upon the strength of the longitudinal current induced by the escape flue at the opposite or discharging end of the furnace."

Seeing, then, that this furnace of defendants was adapted to and did create a zone of maximum heat, we next inquire: At what point would they, in practical manufacturing, desire to locate and use it? Assuming they could locate it so far toward the stack end that the billet could pass through a cooler zone in its progress beyond, we are pointed to no benefit to be derived from such a reckless fuel waste as needlessly superheating and then injuriously cooling the billets. Common sense suggests that the maximum heat zone would in the nature of things be removed as far as possible from the stack end of the furnace. In moving therefore the zone of maximum heat nearer the other end of the furnace, it is clear that, with its location there, instant discharge must be made for two reasons: First, economically, because it is no advantage to raise the billet to the high heat of 2000°

Fahrenheit unless you plan to instantaneously take advantage of that heat; and, second, metallurgically, because if the billet be allowed to fall in temperature, which it does rapidly, "the oxygen in the incoming air would," as we have seen in the proofs quoted, "vigorously attack the billets, causing an extravagant amount of waste." Moreover, if the defendants did not plan their furnace in order to discharge from the zone of maximum heat they could have avoided all possible charge of infringement by simply carrying its billet track through to the end wall and discharging into an incline without the wall as Daelen did. Their persistence in locating their incline within the furnace, and thus inviting litigation, shows that such intra-wall incline location was with the purpose of obtaining intra-maximum zone discharge. And that the two furnaces and their operation is practically the same is shown by the proofs, wherein Wellman, called by the defendants, with a frankness that is commendable, says:

"As I understand it both of these furnaces have the same method of introducing the billet, and the same method of discharging the same. The main difference that I see is in the method of introducing the fuel. In the Morgan patent the fuel is introduced through the sides of the furnace close to the discharge end, while in the defendants' furnace the fuel is introduced through openings in the end of the furnace."

The end-fuel introduction of defendant here referred to appears by reference to the sketch wherein gas ports 9 are located in the end wall immediately above the discharge door. Above these gas ports the end wall is thickened to form an inwardly jutting lintel 21 which contains a chamber 10, into this chamber air is introduced under pressure and from it is projected downwardly through ports 11 into the furnace to mingle with the inflowing gas. The testimony varies as to where the most acute combustion occurs. Wellman admits that "the exact point of highest temperature would be very hard to determine," but says in his judgment in the Morgan Case (and we assume this he would apply to defendants' furnace) it "would be at a point between the point of entrance of the gas and the outlet of the same; probably at a point about 25 per cent. of that distance." McMillan, an experienced engineer called by plaintiff, admits the inability of any one to fix the point of complete combustion, that the zone of such combustion might be three or four feet and longer and shorter, depending on the amount of gas that was being fed. His conclusion was that "there is a certain zone at the discharging end of the furnace at which you must obtain or attain a rolling heat," and says that the point in defendants' furnace where complete combustion is affected is about the position occupied by arch 21 and that between 21 and a point he marks at 22 is the zone of maximum heat.

Bearing in mind that this patent is addressed, not to an exact point of maximum heat, but to a zone of maximum heat, we are of opinion the temperatures taken by defendants and shown by red lines on the sketch clearly show the meeting place of the floor track and discharge incline is within the required zone of maximum heat. Beginning near the end of arch 21, where McMillan says complete combustion takes place, and a point on the incline of the slide, the defendants' heat tests show a heat of 1190° centigrade, or 2170° Fahrenheit. Their next

measurement, which is beyond the junction and toward the stack end, is 1270° centigrade or 2320° Fahrenheit. This difference of 80° centigrade, when these high temperatures are in question, is not proportionately great when the zone is considered horizontally. Indeed, we find substantially the same difference between the bottom and the top of cross-sections of the zone, namely, 1300° and 1380° centigrade at the top as compared with 1270° centigrade below. Without further entering into detail, we have reached the conclusion that by the zone of maximum heat there is meant a regional section of the furnace, and that in both plaintiffs' and defendants' furnaces the billets, while being subjected to such maximum heat in such zones, are discharged by an incline which reaches within such zone. In that regard we agree with defendants' witness, whose testimony was:

"Q. The furnace of the Morgan patent and furnace of the Laughlin and Reuleux patent are intended to operate and do operate in charging, heating, and discharging the billets in substantially the same way, if I understand it correctly; is that so? A. That is right as I understand it. Q. And the defendants' furnace also? A. Yes."

The decree below will therefore be reversed, and the case remanded, with instructions to enter a decree holding claims 3, 4, 5, 6, and 7 valid and infringed.